## TINKER et al. v. THE STATE.

The evidence justified the inference that the defendants shot the hog with
intent to steal the same, but were surprised before they had an oppor-
tunity to fully carry out their design by removing the hog from the
place where it was killed; and the verdict of guilty of an attempt to
commit larceny should be allowed to stand.

Submitted May 22,—Decided July 2, 1906.

Indictment for larceny.    Before Judge Fite.    Dade superior
court.    April 9, 1906.

*J. P. Jacoway,* for plaintiffs in error.

*Samuel P. Maddox, solicitor-general,* contra.

Evans, J.    Stephens and Tinker were indicted for the larceny
of a hog alleged to be the property of William G. Harris; they were
jointly tried, and the jury returned a verdict of guilty of an at-
tempt to commit larceny.    A motion for a new trial was made
upon the general grounds that the verdict was contrary to law and
the evidence.    The motion was overruled.    In the argument be-
fore this court, counsel for the plaintiffs in error contended that,
under the facts appearing in the record, no larcenous intent was
shown, and for that reason the verdict was unsupported by the
evidence.

The State introduced evidence tending to show that William G.
Harris was the owner of the hog described in the indictment, and
that his hogs ranged in the woods where this particular hog was
killed.    A witness heard a gun fire, a hog squeal, and then the
barking of dogs, about three quarters of a mile from his father's
house, and immediately proceeded to the place to investigate.
When he came in sight, he saw one of the defendants holding two
dogs, and the other defendant with sticks in his hands, as if he
was trying to drive a bunch of hogs.    One of the defendants ob-
served the presence of the witness, dropped the sticks and walked
to where the other defendant was, and they exchanged a few words
in a low tone.    One of them then picked up an old-fashioned rifle
gun and a walking stick with a nut on the end of it, and they
started to where the witness was.    He said, "You got them, have
you boys?" and Stephens replied: "Yes, our dogs has killed one of
Bill Harris's hogs."    Witness said, "He has?  Come on and let's
go down and see."    The three went to where the hog lay and the

witness examined it, looking for a bullet hole, when one of the defendants said: "Oh, you can look all you want to; that hog wasn't in the bunch when I shot; I shot at Mr. Harris's old sow, thought it was the old man's sow." Witness proceeded to examine the hog, turning it over and looking at its head, and in reply to the statement of Stephens that the hog was not shot said: "Now, boys, don't lie to me when I was standing over there and watched you put your fingers right down in the bullet hole." Thereupon Stephens said, "I don't see how I ever hit it, when it wasn't even in the bunch." Witness lectured the defendants and left the scene in their company. He then informed the owner of the occurrence, who went to the place where the hog lay and identified it as his property, took it home and cleaned it, finding no marks upon it except a bullet hole which went into its head just below the brain.

In their statements before the jury the defendants claimed that Tom Stephens had recently bought a steer, which had failed to come up and they were out hunting for the animal, following the tracks of some cattle; that one of them shot at a squirrel, and immediately the dogs attacked the hogs and caught one, whereupon one of the defendants beat the dogs off from the hogs, and at this juncture the witness above mentioned came up. Both of the defendants denied shooting the hog.

The evidence was ample to prove that the hog was killed with a rifle, and that the defendants' contention, made on the trial, that the hog was killed by the dogs without being set upon by them, was untrue. Their explanation made to the witness who testified for the State was contradictory to their version of the occurrence given on the trial. The hog was proved to be in good condition; it was killed in the woods about three quarters of a mile from the house where the witness was at the time the report of the gun was heard, followed by the squeal of a hog and the barking of dogs; the hog was killed about two miles from the residence of the defendants, and the prosecutor's hogs ranged in the locality where this hog was killed. He testified that he supposed the defendants were acquainted with the hog, as one of them was at his house about a week before, looking at the hogs and talking about them, and this hog was there at the time. On the trial the defendants made the clear-cut issue that they did not shoot the hog and were in no wise responsible for its death. The evidence justified the

jury in finding this contention to be false, and that the defendants, with knowledge that the hog belonged to the prosecutor, intentionally killed it with a view to carrying it off and fraudulently converting it to their own use. The place and the circumstances under which the hog was shot, the contradictory accounts given by the defendants as to how the hog met its death, and their conduct after they discovered they were being observed by a witness who came upon the scene, sufficiently justified the inference that they shot the hog with intent to steal the same, but were surprised before they had an opportunity to fully carry out their design by removing the hog from the place where it was killed. *Lundy* v. *State,* 60 *Ga.* 143; *Williams* v. *State,* Id. 367. Upon this evidence the jury were authorized to find the defendants guilty of an attempt to commit larceny, and their conviction should be allowed to stand.

*Judgment affirmed. All the Justices concur, except Fish, C. J., absent.*